Good morning, Your Honors, and may it please the Court. Michelle Melton on behalf of Federal Appellants. I'd like to reserve four minutes of my time for rebuttal. To help states meet their obligations to establish pollutant criteria levels under the Clean Water Act, Clean Water Act Section 304 directs EPA to publish non-binding recommendations for water quality criteria reflecting the latest scientific knowledge. CBD, plaintiff here, asserts that EPA must consult under the Endangered Species Act prior to publishing its Section 304 recommendations. The fundamental problem with plaintiff's case is that EPA's 304 recommendations, in contrast with EPA's approvals of state water quality criteria under Section 303C, are just recommendations. The publication of recommendations are not agency action. They do not authorize states or other parties to adopt the criteria. They do not fund states or other parties in developing their own criteria. They do not carry out anything in that they do not put the recommendations into action or practice. And because the 304 recommendations are merely scientific guidance and information, EPA's recommendations do not have any direct or indirect impact on pollution or discharge or behavior, and thus do not affect species. As a result, Section 7 consultation is not required. And the fact that EPA's recommendations are recommendations also means that CBD does not have standing, not least because no remedy in this case can redress their members' alleged injuries, as demonstrated by the fact that since the district court vacated one of the criteria in issue here, at least one state has decided to adopt, and EPA has approved, criteria based on EPA's vacated recommendation. The regulations do seem like they maybe put a thumb on the scale in favor of the 304 guidance, that the state has to provide some explanation if it doesn't adopt them. So why isn't that enough? So I think, Your Honors, conflating two separate processes. There's the process in the triennial review where the states consider EPA's, the latest science in EPA's 304 recommendations, and they have to explain whether they're going to update their criteria or not. And they submit a report to EPA saying, we're going to adopt, and here's the science justifying it, or we're not going to adopt. EPA takes no action on those reports. It just puts them aside, serves a public transparency purpose. When states actually do change their criteria, though, there is no thumb on the scale. They cannot just say, we adopt the 304A criteria, and EPA just rubber stamps it and says, okay, cool, you're all good. That's not at all what happens. What happens when a state, even a state that says they want to adopt EPA's recommendations, they still have to justify those recommendations as appropriate, and EPA reviews whether those recommendations actually are appropriate under the Clean Water Act, and then, of course, does an endangered species analysis. So it's not a rubber stamp. It's not beneficial to the state. It's not necessarily an easier process for the states that do adopt EPA's recommendations. There's no thumb on the scale. There's no presumption, as our briefing makes clear. If they take no action, what does EPA then do? If the states take no action in their trial and review process, nothing. EPA can't impose a standard on them? EPA, there are two ways that EPA can promulgate 303 criteria for a state. The first way is if a state proposes their own criteria, and EPA disapproves those as inconsistent with the Clean Water Act. In that case, the state then has 90 days to fix whatever errors EPA identified, and if the state does not correct those errors to the satisfaction of EPA, EPA can promulgate water quality criteria for the state. The other pathway for EPA to promulgate criteria on behalf of a state is if the administrator makes a determination that the particular water quality standard, and it could be the criteria, it could be the designated uses, it could be the anti-degradation policy, is not serving the purposes of the Clean Water Act. And in that situation, EPA actually doesn't always use its 304A criteria. It often uses those as a basis, but just as an example, Idaho recently had a disapproved mercury criterion. EPA did not start with its 304A recommendations when it was proposing to promulgate new criteria for the state. So it is not the case that EPA comes in, and I'll just one more point on this. In the last 20 years, there have only been 13 federal promulgations for states. It's not something that happens very frequently. It's a fairly high bar under the statute. And of those 13 in the last 20 years, only three were for aquatic life criteria. So it's just not the case that EPA is coming in and telling states what you have isn't good enough, you have to change it. I think the idea, of course EPA can, is sort of like a break glass in case of emergency kind of thing, come in and promulgate criteria for a state, but it's not the preference under the Clean Water Act. Congress really puts states in the driver's seat. The record seems to indicate, at least as I understood it, I may be wrong, that over time the states have primarily adopted the guidance standards. Is that correct? It really depends on which pollutant you're talking about. If you're talking about for cadmium, I believe plaintiffs have put in their supplemental excerpts of record a chart that shows states that have adopted over time EPA's cadmium criteria, excuse me, cadmium recommendations as their own criteria. There are problems with plaintiff's chart. First of all, it's just states. It doesn't include territories and tribes. And second of all, states often modify the criteria. So I have, for instance, like North Carolina, which is one of the states that plaintiffs standing declarants talk about, they actually did not just adopt the cadmium criteria. They modified the cadmium criteria for non-trout waters. They recalculated for different trout waters. I'm not here to represent to you today that states don't find this criteria useful, these recommendations useful. They do. The science is very, very good. They find them persuasive. But I will say that when states don't find the recommendations persuasive, they don't adopt them. And I think that's really demonstrated, excuse me, by an example of another criteria recommendation that EPA published in 2016 for selenium. For selenium, EPA made the recommendation more stringent in 2016, significantly more stringent. And the only 11 states, I'm talking traditional states now, not including territories and tribes, only 11 states adopted EPA's selenium criteria. And of those 11, six of them modified the criteria to be less stringent. And part of that is because the stringency, states felt that those recommendations were too stringent, in part because the recommendations were driven by species that were not present in those states, in those six states' waters, or were not present in all of those six states' waters. And so they changed them. And I think that that's a fundamental flaw with plaintiff's theory, that national consultation will result in a uniform standard. States do not just uncritically accept whatever EPA publishes. They, in fact, make decisions to either modify or decline to adopt if they don't agree with them. And that's fundamentally a problem for their standing, but it's also a problem with their sort of, the narrative that they would like to paint about how this would benefit the environment. I don't agree that this would be, that national consultation would necessarily be environmentally beneficial. I think as we saw with the cyanide consultation, it would, it's very challenging, and therefore it takes a very, very long time. It can take years to consult on these things. And then that's just the national consultation. You would have to also consult at the state level. And that would mean that there would be fewer recommendations, less frequent recommendations, fewer recommendations for more pollutants, a longer time period to get the science out there. That itself is a problem for the environment in that, you know, Congress directed EPA to do this because it does want states to update and adopt. But, again, if you do these national consultations, and then the result is driven by species that are not present in state waters, the states are not going to adopt them. And so it will all be for naught. And I just, I don't, I don't agree that this, that states just adopt because it's what the recommendation is. They adopt it because they agree with the science. They agree with, that it reflects the latest science and that it's appropriate for their waters. Your friends on the other side rely on Department of Commerce against New York, which I understand them to be reading for the proposition that, you know, again, the injury results from the actions of a third party, but the actions of the third party are a fairly predictable result of the action taken by the defendant, that that can be enough to satisfy the causation element of standing. What's your response to that? I don't think it's that predictable that states will adopt, will update at the time that EPA publishes. And I do not, I also do not think that it's predictable what they will do. So again, I'll point you to the example of North Carolina. They did not just adopt the cadmium criteria. Even though they adopted the cadmium criteria, the recommendation, excuse me, the recommendations, in part, they modified them for themselves. And so I, I just, I push back on the idea that just because states take what EPA does as, as a recommended model and, and change it, and sometimes they don't do it at all, I just want to point out, that that makes it predictable. But isn't it predictable, reasonably predictable, that the states are going to take the EPA guidance seriously? Yes, I think that's the purpose. I do think that they give them a hard look, for sure. In this case, you've got at least 20 states who adopted the EPA's guidance verbatim, right? I actually am not sure on the numbers of whether it's verbatim or not. Let's just say a substantial number of states. Okay. So, why isn't that, why doesn't that satisfy the predictability aspect of traceability? Well, even if it does, I still think that there's a redressability problem as well, because states can still adopt whatever they want. And so, I mean, I think that coming back, plaintiffs have to demonstrate for their particular states that they named in their declarations, which is Kentucky, Tennessee, Virginia, North Carolina, California, Oregon, Maine, and North Carolina again, that those are the states that will actually change and update their criteria if EPA were to do a national consultation and were to come out with new values for cadmium. And I just think that there's no, it's not just a question of, will any states do it? Will those states do it, especially after they have just adopted new criteria that they believe is scientifically justified and that EPA approved? So, it's not just a question of, will any state at any time adopt? But will these states that have just updated their criteria then go back and do it again when a national consultation, the numbers in that consultation, will be driven by species that may not be present in their waters? But if Your Honors are not persuaded by my standing argument, we do have merits arguments, of course, that this is not an agency action and that there is no effect of any action were there to be one, although I would submit to you that you may end the analysis at the agency action level. My friends on the other side would like this Court to hold that anything that an agency does is agency action, and we think that that's not a tenable reading of the Endangered Species Act. And, in fact, this Court has rejected that reading of the Endangered Species Act in Marble and Burlett. I will additionally say, as I mentioned in my opening, the 304 recommendations do not authorize states to do anything. They also don't put a thumb on the scale. They do not fund anything. They do not carry out action in the sense of implementation, which is, I think, what is the best reading of the Endangered Species Act, Section 7. If there are no other questions from Your Honors, I am happy to reserve the rest of my time for rebuttal. You may. Thank you. Ms. Tonry. Good morning, and may it please the Court. I'm Claire Tonry on behalf of Appellee Center for Biological Diversity. EPA's refusal here to engage in nationwide consultation when it revises criteria that, by EPA's own regulatory design, dictate water quality standards across the nation, it defies the law, both the statute, the regulations, and the Court's precedent. How can you say that it dictates standards across the nation? The states are free to do something else, aren't they? My point here is that it has, in fact, dictated, because at least 29 states, territories, and tribal governments have, in fact, adopted the 2016 criteria. But the states that adopt the criteria are doing it presumably because they think it's a good idea, right? Because they think that EPA has good scientists and knows what it's talking about, and their approach is a sensible one. There's no legal compulsion on them to do that, is there? The legal compulsion is at least two-fold here. The statute requires that states adopt scientifically-based, current science-based criteria for their own waters, and that they protect the water quality of their state. So EPA's amassing of what they say is very good science is extremely compelling to states, which the record shows do not have the resources or incentive to go out and adopt their own criteria based on their own science. So EPA has done the work for them. In addition, EPA is the one at the end of the day that has to approve or reject the state's criteria. And EPA is also independently required by the statute to step in and promulgate criteria if the states fall down on their obligation to use the best science and protect their water quality up to EPA standards. And in fact, I think every example we've seen where EPA has published criteria directly for a state, and there are numerous examples, they've used their current 304A criteria. So it goes beyond just a persuasive effect. But all of that is consistent with the 304A recommendations generally reflecting good science. It's not that the 304 recommendations as such are compelling on anybody. It's just that what EPA says in those recommendations is usually a good idea, so that's usually why or is usually reflective of good science. And the obligation on the states is to do what is consistent with the science, not what's consistent with what EPA has said about the science, right? Well, I would push back on that a little bit, Your Honor, because EPA's regulations require states to review any new EPA criteria. They require them to do that every three years. It's mandatory. It is indeed action-forcing upon the states. And then EPA directs states to establish numeric values based on either its 304A guidance, its 304A guidance modified to reflect site-specific conditions. So, again, the 304A criteria is the foundation of that. Or other scientifically defensible methods, in which case the state has to proffer, again, its own scientific defense, and EPA has to accept it and approve it. So it's much more than just a suggestion. This is also very distinct from cases where it's one-off guidance that a state can take or leave. Again, the regulations require, they mandate that the states consider any new criteria every three years. Suppose we had, I mean, just take it outside of the Clean Water Act context. Suppose, you know, EPA publishes a book on, you know, how to manage forests, right? And there are lots of states that have their own state-administered forest lands. And if a plaintiff could come in and show, you know, look, everybody has been looking at this book and everybody, the lots of states that do whatever EPA says about how you should manage forests. And now here's a new edition of the book that, you know, we think is, you know, what the book says about how to run your forests is, you know, bad in various ways and is going to cause environmental harm when the states adopt it, as they seem to be doing. Therefore, we want to challenge that. Do you think, I mean, setting aside what the cause of action would be, do you think a plaintiff would have standing in a lawsuit like that? I think that the hypothetical, Your Honor, is incomplete because the question then goes to what is the regulatory regime around EPA's promulgation of forest planning standards? And here we have a regulatory regime where EPA is involved from start to finish and is the ultimate enforcer and decider of whether a state has used the best science as it's required to. And again, EPA has an obligation to promptly promulgate criteria for states that don't meet its standards and don't meet the standards of the Clean Water Act. The fact that EPA doesn't always uphold or timely do that is not a standing question. The court, as the district court did here, has to presume that states and EPA will comply with their obligations under the statute and the regulations to do so. And again, every time EPA has done the direct promulgation, it has used the 304A criteria, including the 2016 cadmium criteria, which are directly promulgated in Oregon. So there's really not a standing issue. We're not in a situation where the court, because again, standing is assessed at the time the complaint is filed, so we're not in a situation where we need to guess at what third parties will do here. At the time we filed the complaint, at least 25 states, including the states where the center's members recreate and go to study and enjoy and observe these species, those states had already adopted the criteria verbatim. So there's no questioning. This completely satisfies the causation test under Lujan versus Defenders of Wildlife, and we're not in that questioning what third parties will do. That analysis gets to what is the regulatory regime? Is it reasonably likely what these third parties will do? And certainly it is here. We have over 30 years of experience with these 304A criteria, and we have the expert wildlife agencies acknowledging that over those 30-plus years, the vast majority of states adopt EPA's criteria verbatim. Isn't that the sort of reasoning that we rejected in Wild Earth? I mean, there the state had a pretty well-established policy. When there are wildlife depredations, we're going to shoot the wolves. And so if the Forest Service introduces livestock, they'll get eaten by the wolves, and then it's very predictable the state under its policy is going to then shoot the wolves. And we said that wasn't enough. So the sort of practical history that states seem to do one thing in response to a federal action isn't necessarily enough for causation. So why is this different? This case is definitely distinct from Wild Earth Guardians versus the Forest Service. And that's, again, because EPA's role in this overall regulatory scheme of water quality standards is entirely unlike the situation in that case where the states were unfettered independent actors and the federal government did not have any control over what the states were going to do. Here, EPA meets the test that this court summarized for causation in that case because it exerts either a determinative or coercive effect, and that's the standard, on state water quality standards. And it does this by, again, either exercising clear regulatory authority over states, which EPA certainly has here. It is the regulator. It is the ultimate approver. So that's one way of meeting this test. Or they can meet the test by being an integral participant in state water quality standards. And EPA meets both of those tests here. But they have the regulatory authority over the states, and they can sometimes be participants in what the states are doing. But I don't understand how either of those authorities is what they're exercising here. Like, all they're doing here is offering this guidance that, like, somewhere down the line, EPA may impose its own criteria. Somewhere down the line, EPA may review what the states are doing. But the issuance of this guidance does not dictate how anybody is doing any of the subsequent things, does it? It has, in fact, in this case at the time. If this is a standing question, it has, in fact, in this case, dictated directly the water quality standards that were ultimately adopted. And that is, you know, this. I would turn the court to the contrast between this case and Alliance for Hippocratic Medicine. There, the question was just, you know, is it reasonable? Is there any reason for believing this is how the system will work? Well, there, there was none, because all of the alleged fears had never materialized in the history. Here we have decades of this playing out exactly how EPA's regulations have set it up to work, which is that EPA certainly does, I think, as Your Honor acknowledged, put more than a thumb on the scale, really, because they require states to consider the criteria, and they direct states to adopt that criteria verbatim. And if they don't, then they need to provide an explanation, which the record shows states are under-resourced and disincentivized from doing. Let's just assume for a moment that you can get over traceability and whatnot, causation. How about redressability as part of standing? Certainly, Your Honor. And I think that here I would point to EPA's example, their new example, speaking to redressability, that since the criteria was partially vacated, a tribe went ahead and adopted EPA's criteria nonetheless, and EPA approved that. That really shows that it's EPA's act of amassing all of the science and putting together this 700-plus page document and publishing it that is the really powerful act here, because as we've now seen, states and tribes will continue to adopt that criteria so long as EPA has it published. So the redressability here comes from EPA consulting with the expert agencies and reissuing criteria that, in fact, reflects species concerns within its best science, and that that is the document and the act that is so compelling to states that they then adopt it. So, again, the traceability and redressability tests are relaxed here in a case of procedural standing, and the record certainly shows that, as EPA admits, that if it had engaged in that nationwide consultation, its criteria would tend to produce more stringent criteria, and that, again, is what sets this whole chain of events into motion, where states are then required every three years to consider that new updated criteria. But just to be clear, they're required to consider it, but they can say, you know, they're totally free to say, having considered it, we have decided to ignore it. They're not totally free, Your Honor. They need to provide a scientific justification, and it needs to be one that EPA accepts. So EPA needs to accept, okay, you've deviated from what we think is the best science. So it's a high bar. Maybe I'm confusing two different – I thought there was a context in which they had to provide an explanation, but it did not have to be a scientific explanation. Is that a different context? If a state does not make any changes to its water quality criteria, the state needs to provide an explanation of why it is. And those can be challenged, certainly, but at the end of the day the Clean Water Act and EPA's regulations provide a backstop. It doesn't allow states to indefinitely postpone their obligations to update their criteria and have it be protective of water quality standards. The statute requires it to be protective. The regulations require it to be protective. And then, again, the regulations require EPA to step in if it's not. So it is not a free license to delay, and it's not a free license to adopt any criteria that the state desires. It needs to meet EPA's scientific criteria. It needs to convince EPA. EPA is, at the end of the day and the beginning of the day, the agency that's driving this process and that has to approve. Maybe you could turn to the merits for just a few. Certainly, Your Honor. The EPA's argument on the merits boils down to an argument that agency action in the Endangered Species Act is limited to just a subset of actions that directly authorize or implement on-the-ground activities. But that argument is foreclosed by the text of the Endangered Species Act. It's implementing regulations and by binding precedent. First of all, starting to the text, nothing in the Endangered Species Act limits agency action to those actions that directly alter the physical world. Those terms appear nowhere in the statute. In contrast, the statute actually provides that any action is subject to consultation. It doesn't have any limiting factors based upon direct implementation or effects on the physical world. And the Supreme Court and this Court have repeatedly recognized that agency action is to be construed broadly in the statute. In addition, the regulations promulgated by the expert wildlife agencies that are authorized by Congress to implement this act, they expressly include all activities or programs of any kind, including those that indirectly modify water. So this really forecloses EPA's argument that it needs to be a direct on-the-ground effect. The regulations plainly say indirectly is included. And then I think National Association of Home Builders versus Defenders of Wildlife is really instructive here. In that case, the Supreme Court held that EPA's delegation of the Clean Water Act permitting program to states is an action authorized, funded, or carried out by a federal agency. So meeting the plain language of the Endangered Species Act. Despite that that action did not authorize, fund, or carry out anything on the ground. And the 304A criteria likewise fall within that plain language of the statute. Because what EPA is doing is it's authorizing states to adopt its criteria without doing anything further. Whereas in contrast, if a state wants to adopt other criteria, they have to develop their scientific defense for that. And here EPA not only authorizes or allows states to adopt its criteria, it requires states to consider the criteria every three years and incentivizes the states, again, to adopt that criteria verbatim. And again, the regulatory regime just carries this all the way through. If states fail to update the criteria, then EPA is statutorily required to step in and promulgate. And again, EPA has done that numerous times. It uses its 304A criteria. So EPA's kind of far-fetched examples in its briefing, like press releases, these have none of the same teeth. They don't have any of the same coercive features. So EPA's argument here that this is a slippery slope, I think it's really misplaced. I think it's telling that EPA doesn't offer any on-point examples and it goes to far extremes that are not at issue here. So at the end of the day, this case is really about a regulatory regime that goes beyond authorizing, which is all that the Endangered Species Act requires, and it goes to a scheme that is affirmatively action-forcing and it's coercive, if not determinative in every circumstance. And I think that it's really important that EPA concedes here and has long recognized that approving a state's adoption of its criteria is an agency action under the Endangered Species Act. So the debate is not really about whether there is an agency action in this chain of events. It's really only about what level does EPA have to consult at. Does EPA need to consult when it establishes this program-level decision and it sets this whole thing in motion? 30 years of this court's precedent clearly says the answer to that question is that they need to consult at the programmatic level when they start this chain of events. From this court's decision in Environmental Defense Center versus Bureau of Ocean Energy Management, which the Supreme Court recently denied cert on, all the way back to 1994 and 1992, Pacific Rivers Council versus Thomas is another good example. This court has consistently held that programmatic documents constitute agency action under the statute and require that program-level consultation, even though separate authorizing decisions are required at the project level before any ground-disturbing activity is going to happen. So this really forecloses EPA's argument and it's really, at the end of the day, an argument to just repackage arguments that have been rejected by this court. And unless the court has other questions about agency action, I'll turn briefly to the other piece of the merits, which is the may affect threshold. This case and EPA's revision of its criteria for a toxic water pollutant easily surpasses the may affect bar. It's a low bar, as this court has held in Kuruk Tribe. EPA's criteria, again, they in fact change toxic pollution standards across the nation in waterways inhabited by scores of endangered and threatened species. And the record is replete with evidence, again, from the expert wildlife agencies, showing that cadmium at these levels is harmful to sturgeon, to sea turtles, to salmon, whales. Our brief at pages 22 and 47 compiles a long list of record citations showing where the expert agencies determined that there would be harmful effects. And, you know, EPA doesn't really contend, truly, that the criteria will have no effect. Their claims are about uncertainty, about where the effects precisely will occur. But that is inconsistent with a no effect finding, which EPA has not made here. And I see that I'm out of time. Thank you, Your Honors. Thank you, Counsel. Thank you, Your Honors. I just have a couple of points. I'd like to start, if I may, with clearing up a few factual points that I heard from my friends on the other side. First, it's not correct that all of the states that are reflected in their chart that have adopted some version of the 304A recommendations did so verbatim. I heard the word verbatim used. At least eight have modified the criteria. So that's just the first factual point. The second point is just, as I mentioned when I was first up here, there is no scientific justification required at the triennial review stage. The scientific justification, as Judge Miller, you pointed out, happens at the — if and when states adopt S303 criteria and then EPA reviews that. That's not — it is not correct that states have to offer a scientific justification during the triennial review process or after the triennial review process when they're justifying not adopting any new criteria for which EPA has promulgated — excuse me, issued regulations. The third point is just that I heard my friend on the other side saying I'm not — it was a little ambiguous. It's not true that when states adopt the 304A recommendations as their criteria, that they can just do that without anything further. There is still a scientific review and an appropriateness review and a review to make sure that the 304A recommendations, as adopted, are actually appropriate in those states' waters. I have a couple of other points. So the question here is not whether EPA ever has to consult. Of course, as our briefing mentions, EPA does consult when it approves state water quality criteria under Section 303. To the extent that there's any regulatory pressure, it is at that point. It's not when EPA publishes the recommendations. And I think that that's also why I find it difficult to believe that states will actually adopt the new criteria, and this goes to their addressability issue, if EPA actually consults. They've already adopted the 2016 criteria in some form, modified or not, and the services have already signed off on that. So I'm not sure why states would revisit the criteria that they have already adopted when they've already gone through a consultation process that addressed these issues. And so I think that's a fundamental problem for my friends on the other side on addressability. Turning to the merits, Judge Miller, you offered an example in the context of standing, but I think it's also true in the context of the merits. It's not the case that we're — I mean, I do think that — my friends on the other side think that press releases are agency actions, but we don't really need to go to those extremes here. I think the example of some sort of technical assistance for foresters, I think, is a good example. I think that BLM, the Forest Service, other land management agencies often put out helpful information. EPA does as well put out scientific information and guidance for regulated entities. And so I think the concern from the government side is not just that this program will be subject to consultation, but that more broadly you'll have a lot of — there will be a chilling, because a lot of things that the government does are in the form of assistance and guidance, often to regulated parties over whom there is some control at some point of their conduct. And I'll just offer some examples that we also — one of which we also offered in our brief. If the Geological Service puts out a map, a finely detailed map, a mineral map, based on their projections, I think that that — my friends on the other side would certainly say that that's an agency action. And if that mineral map overlapped with species habitat, I think that they would say that consultation is required there. I think if, for instance, the Park Service issued a higher-resolution trail map that allowed people to finally sort of see where the trails are and induced more people to go onto those trails, I think there's a concern that that would also be agency action and the consultation would be required. I think weather forecasting is another one. In D.C. we talk about cherry blossoms. Here I think super bloom forecasts are another instance of scientific information that the government is putting out that just does not have — is not subject — is not agency action, is not subject to the Endangered Species Act. There are innumerable scientific studies, scientific information that the government issues all of the time that they're just not required under Section 7 to engage in consultation with. And whether that's because there's no effect or whether it's because it's not agency action, I think that the conclusion is the same. Okay. I just have a couple other points on the merits. My friends keep pointing to the statutory text, but then they keep deferring to the regulations. But the regulations themselves talk about action authorized, funded, or carried out. And I will say that I heard no answer about what it means to carry out for my friends. They seem to think that it means everything. Every government action is something authorized, funded, or carried out. I just don't think that that's consistent with the statutory text, and I don't think that it's consistent not only with those — with those words, but with the entire sort of gist of Section 7, which discusses projects, which discusses permits and licenses and things that happen in the physical world. And I am running short on time, and I hear that the Court has no questions, but I would like to just make one other point here, which is that the Clean Water Act is not about compulsion. It's about cooperative federalism, and Congress structured things this way so that EPA could provide guidance and a backstop. But that does not mean that EPA is compelling any state to adopt any particular water quality criteria. If there are no further questions, we ask the Court to reverse. Thank you very much. And we thank both counsel for their helpful arguments, and the case is submitted.
judges: THOMAS, PAEZ, MILLER